Morris L. MARKEL and Fannye Markel, each in the name and on behalf of Markel Electric Products, Inc., as well as Individually, on behalf of himself and herself, and on behalf of all other similarly situated present or former shareholders thereof, and, Markel Heater Corporation, Plaintiffs,

v.

SCOVILL MANUFACTURING COMPANY, a corporation, Markel Electric Products, Inc., a corporation, David Markel, Lester M. Markel, Robert H. Jacobson, F. E. Warner, Walter R. Bush, John Washburn, James Rankin, Leonard F. Leganza, and John Doe and Richard Roe, being co-conspirators whose identity is presently unknown, Defendants,

v.

The MORRIS MARKEL TRUST OF DECEMBER 6, 1967, Additional Defendant on Counterclaims.

Civ–78–269.

United States District Court, W. D. New York.

May 22, 1979.

Decided May 23, 1979.

Raichle, Banning, Weiss & Halpern, Buffalo, N. Y. (Arnold Weiss, Buffalo, N. Y., of counsel), for plaintiffs.

Davis, Polk & Wardwell, New York City (Steven F. Goldstone, Susan K. Jackson, and Ahuva Genack, New York City, of counsel), for defendants Scovill Manufacturing Company, John Washburn, James Rankin, and Leonard F. Leganza.

Rogers & Wells, New York City (James M. Ringer, New York City, of counsel), for defendants Markel Electric Products, Inc., David Markel, Lester M. Markel, Robert H. Jacobson, and F. E. Warner.

CURTIN, Chief Judge.

This case involves a number of claims asserted by Morris L. Markel and Fannye Markel, individually and on behalf of Markel Electric Products, Inc. ["Markel Electric"], and by Markel Heater Corporation ["Markel Heater"]. The defendants are Markel Electric, Scovill Manufacturing Company ["Scovill"], and a number of named and unknown individuals including two other members of the Markel family. The plaintiffs allege fraud by the defendants in connection with the purchase by Scovill of the controlling shares of Markel Electric and the subsequent sale of Markel Electric's assets to Scovill.

The part of the action presently before the court is a counterclaim asserted by defendants Markel Electric, David Markel, Lester M. Markel, Robert H. Jacobson, and F. E. Warner. They allege that the plaintiffs, operating as a new business under the name "Markel Heater Corporation," are engaging in unfair competition by infringing

on the common-law trade name and trademark of the defendant, Markel Electric. Defendants contend that they have the exclusive right to use the name "Markel" and that "Markel" or "Markel Electric," or any combination of those names with other words, have come to mean to people in the electric heater industry, and to the public in general, electric resistance heaters sold by the defendant Markel Electric Products, Inc.

The defendants press alternative grounds for relief under § 368–d of the New York General Business Law (McKinney's 1968), which protects a person against dilution of his trademark or trade name, and § 43(a) of the Lanham Act, 15 U.S.C. § 1125(a), which prohibits unfair competition in the form of misrepresentation as to the origin of one's product.

The defendants have moved for a preliminary injunction restraining the plaintiffs *inter alia* from using the name Markel in their business. Oral arguments were presented on February 21, 1979 and an evidentiary hearing was held on March 27, 1979. The motion has been submitted for decision.

 The Second Circuit recently has clarified the standard for issuance of a preliminary injunction:

> there must be a showing of possible irreparable injury *and* either (1) probable success on the merits *or* (2) sufficiently serious questions going to the merits make them a fair ground for litigation *and* a balance of hardships tipping decidedly toward the party requesting the preliminary relief.

*Caulfield v. Board of Education of City of New York,* 583 F.2d 605, 610 (2d Cir. 1978). This test is applicable to a claim alleging unfair competition and trademark infringement. *See Beech-Nut, Inc. v. Warner-Lambert Co.,* 480 F.2d 801 (2d Cir. 1973); *Hills Bros. Coffee, Inc. v. Hills Supermarkets, Inc.,* 428 F.2d 379 (2d Cir. 1970). Application of this standard requires a review of the factual background of this case and the legal standards which govern it.

## I. FACTUAL BACKGROUND

The affidavits and evidence put forth at the hearing present the following scenario. Markel Electric Products, Inc. was founded by Joseph Markel in the early 1920s. Since the firm's name was changed to "Markel Electric Fitments, Inc." in 1923, the family name Markel has been in continuous use by the defendant company. This family business manufactured and distributed lighting fixtures from 1920 to the late 1950s, and it has been manufacturing and distributing electric heaters since 1923. Although the company also began to manufacture truck bodies in 1971, its primary business activity, except for a brief period during World War II, has been for some time the manufacture, sale, and distribution of electric heaters of various kinds and related products. It is apparent from the affidavits presented by the defendants that the firm always has attempted to compete in its industry by marketing a high-quality product and by providing excellent service.

Among the types of heaters which the company has marketed have been baseboard, fan-forced, and portable heaters. Mr. David Markel, son of the company's founder and president from 1966 to 1978, testified that there have been several models or series of heaters, and the company has given names to specific models or series of heaters. These have included, for example, "Fan-Glo," "Heetaire," and "Neo-Glo." Mr. Markel testified that, although the company did promote these specifically-named models, the mark or name Markel always has been used in conjunction with them.

On May 22, 1978, 84% of the outstanding shares of stock of Markel Electric was sold to Scovill. According to representatives of Scovill, a significant reason for Scovill's decision to purchase Markel Electric was the strength of the Markel name and its reputation in the electric heating industry. On July 18, 1978, Scovill purchased all of the assets of the company, including its rights in the trade name and trademark Markel. Included in this assignment was the application, filed by Markel Electric on June 12,

1978, to register the mark Markel on the Principal Register pursuant to the Lanham Trade-Mark Act, 15 U.S.C. § 1052(f). Markel Electric owned an expired registration, issued on February 8, 1949. Subsequent to the hearing on this motion, defendants filed with this court, as a supplement to the affidavit of Dallett Hoopes, a copy of a Certificate of Registration, Reg. No. 1,116,004, showing that the mark "Markel" was registered in the Patent and Trademark Office on April 3, 1979.

Sometime after Scovill's purchase, the logo of the company was changed. Prior to sale, "M MARKEL" was utilized generally, with the isolated "M" appearing in a star-like ground.[1] Afterwards, the logo

> Markel
>
> NuTone Division Scovill

has been used on the company's packaging and literature.[2] Even with this change, however, the Markel name rather than Scovill has been emphasized.[3] An additional change which has occurred since Scovill's purchase involves the company's marketing strategy. Prior to the acquisition, Markel Electric marketed its products principally through manufacturer's representatives, independent contractors compensated on a commission basis. The company now markets through the sales force of the NuTone Division of Scovill. According to testimony at the hearing, one reason for the change in logo was to publicize this marketing system.

Prior to Scovill's purchase of the controlling share of Markel Electric's stock, members of the Morris Markel family, disenchanted with the proposed sale of the family business, incorporated Markel Heater Corporation as a vehicle for their efforts to purchase the stock of other shareholders of Markel Electric. After this effort to thwart the sale of the company to Scovill failed, Markel Heater began to distribute baseboard heaters, wall heaters and thermostats which it purchases from a manufacturer for distribution under its own name. This new company is using some of the same manufacturer's representatives who formerly represented Markel Electric in the marketing of its products. Although Markel, NuTone Division of Scovill, distributes a wider variety of heaters than does Markel Heater, both companies market electric baseboard heaters, wall heaters, and thermostats. Moreover, as to baseboard heaters, both companies distribute a similar range of models; the heaters are in many cases of identical dimensions and wattages.

## II. DISCUSSION OF AUTHORITIES

Although defendants have supplemented their papers to show that the mark Markel is now registered, defendants' motion is not based on § 32 of the Lanham Trade-Mark Act, 15 U.S.C. § 1114. Rather, defendants are claiming that plaintiffs, by using the name Markel in their business, are engaging in unfair competition by infringing defendants' common-law trade name and trademark. Defendants claim, moreover, that plaintiffs have engaged in unfair competition under § 43(a) of the Lanham Act, 15 U.S.C. § 1125(a), and under New York General Business Law § 368–d (McKinney's 1968).

■■■ Trademark and trade name infringement can be understood as part of the broader field of unfair competition. The essence of a claim under trademark infringement or unfair competition is the likelihood of confusion caused by the violation among prospective customers. *Grotrian, Helfferich, Schulz, Th. Steinweg Nachf.*

---

1. *See, e. g.,* a photocopy of the cover of a binder formerly given to distributors by Markel Electric, attached to Defendants' Supplemental Memorandum as Appendix 3.

2. *See* promotional material attached to Defendants' Supplemental Memorandum as Appendix 4; price sheets for various heaters of defendant company, attached to Defendants' Memorandum as Appendix 3.

3. *See, e. g.,* the cover of the binder distributed by Markel NuTone to distributors, Plaintiffs' Exhibit FFF and Defendants' Exhibit 10. A photocopy of this cover is also attached to Defendants' Supplemental Memorandum as Appendix 2.

*v. Steinway & Sons,* 523 F.2d 1331 (2d Cir. 1975); *Maternally Yours, Inc. v. Your Maternity Shop, Inc.,* 234 F.2d 538 (2d Cir. 1956); *Polo Fashions, Inc. v. Extra Special Products, Inc.,* 451 F.Supp. 555 (S.D.N.Y. 1978). When a party alleges infringement of a common-law trade name and trademark, it must show, first, that the name or mark has developed a secondary meaning. *Maternally Yours, supra,* at 544. In other words, a party must show that its use of the name has been of such a nature and duration that it identifies products bearing the name as originating from that party. In addition, the party must demonstrate that it is the owner of the name and mark and, of course, that use by the alleged infringer is creating a likelihood of confusion. *See* 3 Callman, The Law of Unfair Competition Trademarks and Monopolies §§ 65–66 (3d ed. 1969). The standard under the New York law of unfair competition is essentially the same; under New York law, however, a trademark need not have acquired a secondary meaning in order to be accorded protection. *Maternally Yours, supra,* at 544; *Polo Fashions, supra,* at 558.

■ The common element of all the theories relied upon by the defendant is the likelihood of confusion. Regardless of which theory is used, the standards for determining this likelihood are the same. *Mortellito v. Nina of California, Inc.,* 335 F.Supp. 1288, 1294 (S.D.N.Y.1972). In this case, the following factors must be weighed in making this determination: the strength of the defendant's mark or name; the intent of the alleged infringer in adopting its name; the degree of similarity between the marks and the products of the respective parties; the competitive proximity of the products; the degree of care likely to be used by prospective customers; and, any actual confusion. *Steinway & Sons, supra,* at 1336; *Carl Zeiss Stiftung v. VEB Carl Zeiss, Jena,* 433 F.2d 686, 705 (2d Cir. 1970), *cert. denied,* 403 U.S. 905, 91 S.Ct. 2205, 29

L.Ed.2d 680 (1971); *Menley & James Laboratories, Ltd. v. Approved Pharmaceutical Corp.,* 438 F.Supp. 1061 (N.D.N.Y.1977).

### III. MERITS

*SECONDARY MEANING*

■ This issue does not require extensive discussion. The defendant company has used the trade name and trademark Markel continuously for over 50 years. The company has expended considerable sums of money advertising and promoting its products, and I accept the testimony of David Markel that the name Markel was always used in conjunction with the promotion of any of Markel Electric's more descriptive marks specifying particular models or series of electric heaters.[4] Moreover, it is undisputed that sales of the company have increased substantially from $5.2 million in 1968 to $20.2 million in 1978. Markel Electric has been successful in achieving recognition for its products among its potential customers. One cannot discount either the statements by Scovill representatives that a principal reason for Scovill's purchase of Markel Electric was the strength of the Markel name and its strong reputation as a distributor of electric heaters of high quality. Markel Electric's long and substantial use of the name Markel in its business has been such as to identify products bearing the name as originating from Markel Electric. Thus, Markel has acquired a secondary meaning.

*OWNERSHIP*

■ A party which claims to have the exclusive ownership of a common-law trade name or trademark must demonstrate that it was the first party to have used it in connection with a particular product. There can be no question here but that Markel Electric was the first party to use the name Markel in connection with the distribution of electric heaters.

---

4. Mr. Markel's testimony is reinforced by a review of Defendants' Exhibits 5, 6, and 7, which show the name Markel prominently used in conjunction with the mark "Heetaire." Exhibits 5 and 6 show that this use dates back

some years, to 1927 and 1940, respectively. Defendants' Exhibit 3 is also revealing; it shows the prominent use of the name Markel in more recent advertising of the various series of electric heaters.

■ Moreover, "[t]he legitimate successor to the first user's business stands in the latter's shoes, and his rights will date from the first use. 3 Callman, The Law of Unfair Competition, Trademarks and Monopolies, §§ 76.2(c), (h), pp. 284–285, 294–295 (3d ed. 1969) (Footnotes omitted)." *D. M. & Antique Import Corp. v. Royal Saxe Corp.,* 311 F.Supp. 1261, 1271 (S.D.N.Y.1970). In this case, Scovill acquired by assignment Markel Electric's trade name and trademark, and Markel, Nutone Division of Scovill, as successor to Markel Electric, has the rights of the first user.

■ Plaintiffs contend that defendants, by altering the logo of the company from "M Markel" to "Markel, NuTone Division of Scovill" and by emphasizing its NuTone and Scovill connections, have abandoned the name. This is not persuasive. First, the continued prominence accorded to "Markel" in the logo of the company and the continued use of the name in its packaging and promotional literature demonstrate that the name Markel has not been abandoned in a practical sense. *Cf., Royal Saxe, supra,* at 1271. Moreover, the combination or use of Markel with other names does not of itself constitute abandonment. *Drexel Enterprises, Inc. v. Richardson,* 312 F.2d 525 (10th Cir. 1962). Second, the very act of counterclaiming against Markel Heater for infringement of its rights in the name Markel indicates the lack of any intent to abandon the trade name and trademark Markel. Under these circumstances, plaintiffs' argument of abandonment must fail. *See Saxlehner v. Eisner & Mendelson Co.,* 179 U.S. 19, 31, 21 S.Ct. 7, 45 L.Ed. 60 (1900).

## LIKELIHOOD OF CONFUSION

As discussed above, a determination of the likelihood of confusion in a particular case requires consideration of a number of factors. First, with respect to the strength of defendant's name and mark, this opinion has already concluded that the name Markel has acquired a secondary meaning with regard to electric heaters. Markel Electric's use of the mark and name Markel in its business has been long, continuous and substantial. The recent use of that name in conjunction with "NuTone Division" or with "Scovill" cannot be said to weaken its strength. I find that Markel is a strong mark and recognized name in the electric heating industry.

A factor which is of course important to a determination of the likelihood of confusion is the similarity of the trademarks or trade names in question. Whether one views the senior company's trade name as Markel Electric or Markel NuTone, the dominant part of the name is "Markel," just as the dominant part of Markel Heater is "Markel." The plaintiffs point out, and the court recognizes, that Markel Heater markets its name under the trademark "$M_H$ Sentinel." A visual scanning of the packaging in which plaintiffs market their heaters, however, reveals that the name Markel Heater Corporation is clearly visible on the side of the box. Moreover, plaintiffs' promotional literature includes the Markel Heater name. *See* the Affidavit of F. E. Warner, which has a specification sheet of Markel Heater attached as Exhibit A. Even the "$M_H$" component of Markel Heater's "$M_H$ Sentinel" trademark suggests a link between plaintiffs' products and the Markel heaters produced by defendants. As the Second Circuit recently has stated: "One who adopts the mark of another for similar goods acts at his own peril and any doubt concerning the similarity of the marks must be resolved against him." *American Home Products Corp. v. Johnson Chemical Co., Inc.,* 589 F.2d 103, 107 (2d Cir. 1978). Although in this case plaintiffs have adopted a similar name as a trade name, this instruction is valuable in light of plaintiffs' highly visible use of that name in its marketing.

Two additional factors to be considered are the degree of similarity between the litigants' products and the competitive proximity of these products. The defendant company and Markel Heater both distribute electric baseboard and wall heaters. The heaters are different in certain respects. Markel NuTone's heaters have unique steel heating elements and fans

while Markel Heater's are made of aluminum. Nonetheless, both distribute electric heaters which are quite similar and in many cases are of identical dimensions and wattage ranges. *See* Affidavit of F. E. Warner, ¶ 7. Although the older company manufactures and distributes a much wider range of heater types and models, both companies have similar targets for their products. The principal customers for both are heating and air-conditioning contractors and electrical distributors. There was testimony by Frederick Warner to the effect that an expert such as an electrical contractor could tell the difference between the two products by looking at them, but that an ordinary person could not.

A factor related to the similarity of products and their competitive proximity is the degree of care likely to be used by potential customers. Plaintiffs argue that since electrical contractors or other purchasers sophisticated enough to tell the difference between the products make up a large bulk of the potential customers of both companies, there is little likelihood of confusion. Moreover, plaintiffs argue that heaters are selected by model numbers, not company names, and that distributors display the heaters in such a way that the Markel Heater name is not visible, thus precluding confusion.

Plaintiffs' argument is not without some merit. Certain sophisticated purchasers may differentiate among the heaters based on product differences and some customers may be aware that Markel Heater and Markel NuTone are distinct, unrelated companies. Unless the percentage of such potential customers is very large, however, it is unclear how significant this fact is. Plaintiffs' argument ignores, moreover, the very direct competition between the two companies for the same customers for their heaters, and it ignores the customers of the general public who cannot discern the differences between the products.

The defendants also have submitted affidavits which assert that instances of actual confusion among customers of the defendants have occurred. Although it is not necessary for defendants to show actual cases of confusion, *Maternally Yours, supra,* at 542, the presence of actual confusion is strong evidence of the likelihood of confusion. *Helene Curtis Industries v. Church & Dwight,* 560 F.2d 1325 (7th Cir. 1977); *Polo Fashions, supra.* Defendants' affidavits are from sales representatives of the NuTone Division of Scovill (*see* Affidavits of Lee E. Roberts, John F. Bates, Frank A. Battaglia, John Chrzan, and Dee L. Smallwood), and from an electrical distributor (*see* Affidavit of Richard Teske). The sales representatives claim that numerous instances of confusion have occurred among electrical distributors and contractors in a number of geographical areas including San Diego, California, Upstate New York, and Massachusetts. According to the affidavits, some distributors believed they had the specifications or promotional literature of "Markel" heaters when in fact they had material from Markel Heater, and there were questions among distributors as to why, if NuTone was now representing Markel, certain manufacturers' representatives also purported to be selling "Markel heaters." Finally, at the hearing John T. Cruickshank, General Sales and Marketing Manager for the NuTone Division of Scovill, testified that he had received numerous calls from regional sales managers and field people concerning confusion among customers as to who represents and sells "Markel" heaters.

The affidavit of Mr. Teske, an electrical distributor and manager of an authorized service station for a number of manufacturers of electric heaters, raises another problem, that of palming off or misrepresentation. He claims that a representative of Markel Heater, in approaching him about becoming an authorized dealer for "Markel Heating Products," informed him that there would be two lines of heaters. The distributor mistakenly believed he would be an authorized dealer for the established Markel heaters. Even if one assumes that some of the confusion was in the mind of this affiant himself, any lack of candor or precision by representatives, to say nothing of delib-

erate misrepresentation, obviously can create confusion. The assertions in the affidavits of the sales representatives reinforce this concern.

A final note about instances of actual confusion should be made. Defendants submitted the affidavit of Bud McCarthy, the service manager of Markel-NuTone. He states that a customer from out-of-town [outside the Buffalo area] informed him that the telephone directory assistance had given him the number of Markel Heater when he had asked for "Markel." Defendants persuasively argue that such confusion is inevitable when two companies in the same area distribute the same products and have such similar names.

█ A final factor which must be considered is the intent or purpose of the plaintiffs in adopting and using the name Markel in their business. Because the individual plaintiffs, as members of the Markel family, were well aware of the existing Markel company, it is not unreasonable to infer that they adopted the name Markel Heater Corporation with the purpose of capitalizing on the good will and reputation established over the years by Markel Electric. *See Chas. S. Higgins Co. v. Higgins Soap Co.,* 144 N.Y. 462, 39 N.E. 490 (1895). The context in which Markel Heater began to distribute electric heaters, the aftermath of an unsuccessful attempt to prevent sale of a family business to a conglomerate, also suggests that this is a reasonable inference. Although a showing of wrongful intent is not required, the existence of a purpose to foster the impression that it was the distributor of the same heaters as Markel Electric is a strong indication that confusion will occur in fact. *Polo Fashions, supra,* at 562; *Mortellito, supra,* at 1294–95.

█ I conclude, after reviewing all of the factors discussed above, that defendants have demonstrated a strong likelihood of confusion. Where the trade name of the alleged infringer is so similar to that of the claimant, and when the two companies market the same products to the same potential customers, confusion among their customers is highly likely if not inevitable. *Hills Bros. Coffee, Inc. v. Hills Supermarkets, Inc., supra,* at 381. This is especially true when there is a strong inference that the alleged infringer adopted its name with the purpose to cash in on the reputation established by Markel Electric and to cause the corresponding confusion as to the origin of its products. Markel Heater's use of the trademark "$M_H$ Sentinel" does not negate this conclusion. The court notes as well that the instances of actual confusion asserted in the affidavits of the sales representatives of NuTone Division of Scovill are not without importance. Even allowing for the interest which the affiants may have in the outcome of this case, I believe the affidavits indicate at the very least that defendants might well prove these instances of actual confusion at a trial on the merits.[5] As stated above, evidence of actual confusion strongly suggests that there will be a likelihood of confusion as to a product's origin. *Polo Fashions, supra.* The court concludes by noting that any doubts with respect to the factors in consideration should be resolved against the newcomer to the industry, in this case Markel Heater. *Menley & James Laboratories, supra,* at 1066. Defendants have demonstrated sufficiently that there is a strong likelihood of confusion in plaintiffs' present use of the name Markel in their business.

## SUMMARY

█ The first prong of the *Caulfield* standard for granting a preliminary injunction requires that the moving party show probable success on the merits and irreparable harm. *Caulfield, supra,* at 610. The

---

5. At this point the facts are not entirely clear. *See* Supplemental Affidavit of William Markel, filed April 6, 1979, at 5, which asserts that defendants are pressuring customers into signing statements to the effect that they are confused about the origin of "Markel" heaters. I believe, however, that the confusion alleged by defendants is not implausible, and that the allegations suggest at the very least that the indirect marketing of both companies precludes the probability that a bulk of the potential customers for litigants' heaters would know that Markel Heater and Markel Electric are not connected.

defendants have shown probable success on the merits on their claim that plaintiffs are engaging in unfair competition by infringing defendants' common-law trade name and trademark. As discussed above, the defendants have demonstrated: (1) ownership of the mark and name Markel; (2) that "Markel" has acquired a secondary meaning; and, (3) that a likelihood of confusion among prospective customers as to the origin will occur if plaintiffs are permitted to continue their present use of "Markel" in their business. As the Second Circuit has stated, the issue is not the possibility that a customer would buy a Markel Heater heater thinking it was actually a Markel Electric or, now, Markel NuTone heater. Rather, the harm to defendants is the likelihood that potential purchasers of electric heaters will think that there is some connection between the Markel Heater and the defendants' heaters. *Steinway & Sons, supra,* at 1342. Defendants have shown this likelihood.

■■■ In addition to the common-law claim, defendants rely on § 368–d of the New York General Business Law, which protects against unfair competition and against dilution of a party's trademark, whether the mark is registered or not.[6] A party seeking relief against alleged infringement of its trademark need not show secondary meaning for its mark to prevail under New York law. *Menley & James Laboratories, supra,* at 1066; *Mortellito, supra,* at 1295. Moreover, the injury that is caused by dilution differs from that caused by orthodox confusion; even where no confusion exists, the strength of a mark or

trade name may be weakened by another's continued use of it. *Mortellito, supra,* at 1296. Not only have defendants shown that a likelihood of confusion will be caused by plaintiffs' use of the Markel name, there is a strong likelihood that they could satisfy the less stringent requirement of showing dilution, or a weakening of the identity and advertising value of their mark through Markel Heater's use of the Markel name. Thus, they have shown probable success under this theory as well.

■■■ Defendants also assert a claim under 15 U.S.C. § 1125(a), which provides a federal statutory remedy against unfair competition through the use of a false designation of origin or any false description or representation.[7] Although this section of the Landham Act does not have limitless application in cases of unfair trade practices, it was meant to expand the rights of those harmed by unfair competition. *Alfred Dunhill, Ltd. v. Interstate Cigar Co., Inc.,* 499 F.2d 232, 234–35 (2d Cir. 1974). Section 1125(a) "provides relief against that kind of unfair competition which is analogous to the misappropriation or misuse of trade names or trademarks." *Geisel v. Poynter Products Inc.,* 283 F.Supp. 261, 267 (S.D.N.Y.1968). A remedy is provided against the misleading use of words or names which have been adopted by a manufacturer to identify his goods. *Federal-Mogul-Bower Bearings Inc. v. Azoff,* 313 F.2d 405, 409 (6th Cir. 1963); *Geisel, supra,* at 267. A party seeking relief need not prove actual palming off, *Geisel, supra,* at 267, and the essence of a claim is a use of the trade name or mark in a way which is

---

**6.** General Business Law § 368–d provides:

Likelihood of injury to business reputation or of dilution of the distinctive quality of a mark or trade name shall be a ground for injunctive relief in cases of infringement of a mark registered or not registered or in cases of unfair competition, notwithstanding the absence of competition between the parties or the absence of confusion as to the source of goods or services.

**7.** Section 43 of the Lanham Act, 15 U.S.C. § 1125(a), provides:

Any person who shall affix, apply, or annex, or use in connection with any goods or

services, or any container or containers for goods, a false designation of origin, or any false description or representation, including words or other symbols tending falsely to describe or represent the same, and shall cause such goods or services to enter into commerce, . . . shall be liable to a civil action by any person doing business in the locality falsely indicated as that of origin or in the region in which said locality is situated, or by any pe.son who believes that he is or is likely to be damaged by the use of any such false description or representation.

likely to cause confusion or to deceive purchasers as to the origin of the goods, *Mortellito, supra,* at 1294.

I believe the discussion concerning the likelihood of confusion with respect to defendants' common-law claim is sufficient to demonstrate that defendants are likely to succeed on the merits of the § 1125(a) claim as well. The court notes in particular the adoption by plaintiffs of the Markel Heater name despite their awareness of the reputation established by Markel Electric in its field. When the context in which the name Markel Heater was adopted is viewed in conjunction with the other factors which the court must consider with respect to the issue of confusion, one can only conclude that confusion as to the origin of the litigants' products will be likely.

 The defendants have demonstrated probable success on the merits with respect to all three of their theories of liability. The *Caulfield* standard, however, also requires a showing of irreparable harm. In trademark and unfair competition cases, it is recognized that when a party demonstrates a "high probability of confusion, injury irreparable in the sense that it may not be fully compensable in damages almost inevitably follows." *Omega Importing Corp. v. Petri-Kine Camera Corp.,* 451 F.2d 1190, 1195 (2d Cir. 1971); *see Polo Fashions, supra,* at 563. New York General Business Law § 368d embodies this notion as well, as its terms indicate. In this case, defendants have demonstrated a confusing similarity of marks, their senior right to use the trademark, and a high probability of confusion. They appear entitled to injunctive relief.

The plaintiffs argue, however, that defendants should be precluded from any equitable relief because they are guilty of unclean hands. Plaintiffs allege the following in support of this defense:

> Defendants refused to allow plaintiffs to compete with them with respect to the purchase of [Markel Electric]. Defendants "conned" plaintiffs and their Counsel into believing that they were willing to allow them to use Seidman and Seidman, [Markel Electric]'s auditors, while at the same time defendants were meeting in New York City and preparing to consummate the closing of the sale to Scovill. Not until February 14, 1979, did defendants finally admit to the truth.
>
> However, in the prior proceedings in this Court, seeking to enjoin the sale defendants testified falsely, namely: that there were no preparations in the week prior to May 22nd. Defendants' conduct constitutes unclean hands in the acquisition of the trademark, as well as in the prosecution (defense) of this action.

Plaintiffs' Memorandum of Law, dated February 28, 1979, at 18. These allegations are further explained in the affidavit of Fannye Markel, one of the plaintiffs, that the deposition testimony contradicts testimony given by the defendants David Markel and Isador Snitzer at the June 2, 1978 hearing before this court on plaintiffs' motion to enjoin the sale of Markel Electric assets to Scovill. Plaintiffs claim that the attorney for Markel Electric, James Ringer, conceded during the deposition of Stewart Hudnut on February 14, 1978 that defendants had been in New York City on May 16 and 17, 1978 preparing for the closing of the sale of Markel stock to Scovill. This concession is said to contradict the June, 1978 testimony in court that, prior to May 22, 1978, there had been neither knowledge of, nor preparations in connection with, the purchase of Markel Electric stock by Scovill. Plaintiffs argue that the alleged facts demonstrate that defendants have acted inequitably and that two of them committed perjury, requiring this court to deny them equitable relief.

 The court believes that plaintiffs' defense must fail. A review of the transcript of the 1978 court hearing (Transcript of Proceedings, June 2, 1978, at 119–23 and 148–49) and of the depositions pointed to by plaintiffs (Deposition of David Markel, at 195 and 337, and Deposition of Stewart Hudnut, at 156) convinces me that no perjury was committed.

The testimony reflects that Scovill had no obligation to purchase the Markel Electric stock unless 100% of the outstanding shares

were available, but that it could exercise an option to do so (Transcript, at 120). Both David Markel and Isadore Snitzer testified at the 1978 hearing that they did not know for certain whether Scovill would exercise its option until the morning of the closing, May 22, 1978. Snitzer further testified that they previously had prepared papers for an aborted closing of the transaction which was to have occurred on April 28, 1978, but that no preparations for the May 22 closing had been made. Mr. Ringer's so-called concession does not contradict this. He states that Mr. Markel and Mr. Snitzer had been in the New York law office of Rogers and Wells on the 16th and 17th of May, with the purpose of discussing whether a closing could be accomplished and what steps could be taken to encourage Scovill to accept less than 100% of the stock. From this one cannot infer any advance knowledge of a May 22 closing or, at this time, any fraud by the defendants in their purchase of Markel Electric stock. Plaintiffs' attempt to characterize the hearing testimony in such a way as to suggest misrepresentations to the court is rejected.

Therefore, I believe that plaintiffs have failed to demonstrate factual support for their defense of unclean hands. It also is noted that courts are reluctant to apply the unclean hands doctrine in all but the most egregious situations. It will be applied "only where some unconscionable act of one coming for relief has immediate and necessary relation to the equity that he seeks in respect of the matter in litigation." *Keystone Driller Co. v. General Excavator Co.*, 290 U.S. 240, 245, 54 S.Ct. 146, 147, 78 L.Ed. 293 (1933). *See W. E. Bassett Co. v. Revlon, Inc.*, 305 F.Supp. 581 (S.D.N.Y. 1969), *aff'd in part, rev'd and remanded in part*, 435 F.2d 656 (2d Cir. 1970). The court expresses reservations as to whether the defendants' alleged fraud bears that requisite relation but, since the factual allegations of plaintiffs are insufficient, this need not be decided.

### IV.

Therefore, for the reasons which appear above, the court believes that the defendants have satisfied the standard for granting a preliminary injunction set forth in *Caulfield, supra.*

The foregoing opinion constitutes the findings of fact and conclusions of law of this court, in accordance with Rule 52(a) of the Federal Rules of Civil Procedure.

The defendants are directed to prepare an order in accordance with this decision and submit it to the court for signature, with notice to the plaintiffs.

So ordered.